**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2203
_____

In re:  AE LIQUIDATION, INC., ET AL,

Debtors

ANNETTE VARELA, on behalf of herself and all others
similarly situated;
JOHN J. DIMURA, on behalf of himself and all others
similarly situated,

Appellants

v.

AE LIQUIDATION, INC., ET AL, f/k/a ECLIPSE
AVIATION CORPORATION
_____

On Appeal from the United States District Court
for the District of Delaware
(District Court No. 1:14-cv-01492)
Honorable Leonard P. Stark, District Judge
_____

Argued: December 7, 2016
Before: FISHER,* KRAUSE, and GREENBERG, *Circuit Judges*.

(Opinion Filed: August 4, 2017)

Christopher D. Loizides
Loizides
1225 King Street
Suite 800
Wilmington, DE 19801

Jack A. Raisner        (Argued)
Rene S. Roupinian
Outten & Golden
685 Third Avenue
25th Floor
New York, NY 10017

*Counsel for Appellants*

Mark E. Felger
Barry M. Klayman     (Argued)
Cozen O'Connor
1201 North Market Street
Suite 1001
Wilmington, DE 19801

---

* Honorable D. Michael Fisher, United States Circuit Judge for the Third Circuit, assumed senior status on February 1, 2017.

*Counsel for Appellee*

_____

OPINION OF THE COURT

_____

KRAUSE, *Circuit Judge*.

This case arises from the bankruptcy and subsequent closing of a jet aircraft manufacturer, and requires us to assess that manufacturer's obligation under the Worker Adjustment and Retraining Notification (WARN) Act, 29 U.S.C. §§ 2101-2109, to give fair warning to its employees before effecting a mass layoff. On appeal, we are asked to determine whether a business must notify its employees of a pending layoff once the layoff becomes probable—that is, more likely than not—or if the mere foreseeable possibility that a layoff may occur is enough to trigger the WARN Act's notice requirements. Because we conclude that a probability of layoffs is necessary, and the manufacturer has demonstrated that its closing was not probable until the day that it occurred, it cannot be held liable for its failure to give its employees requisite notice. Accordingly, we will affirm the judgment of the District Court, which in turn affirmed the judgment of the Bankruptcy Court.

## I. Background

Appellants are former employees of Appellee Eclipse Aviation Corporation[1] who were laid off when Eclipse unexpectedly closed its doors in February 2009. This shutdown was not expected because when Eclipse declared bankruptcy in November 2008, it reached an agreement to sell the company to its largest shareholder, European Technology and Investment Research Center, (ETIRC)[2]—an agreement that, if it had closed, would have allowed Eclipse to continue its operations. The sale, however, required significant funding from Vnesheconomban (VEB), a state-owned Russian Bank, and this funding never materialized. For a month, Eclipse waited for the deal to go through with almost daily assurances that the funding was imminent and the company could be saved, but eventually, as those assurances failed to bear fruit, the time came when it was forced to cease operations altogether. To explain why layoffs were not probable before that point, however, we must review the development of the relationship between Eclipse and ETIRC, and their prospective financing arrangement with VEB.

---

[1] Eclipse's interests in this litigation are represented by Jeoffrey L. Burtch—the Trustee responsible for administering Eclipse's estate. For simplicity's sake, we will refer to Appellee solely as "Eclipse."

[2] ETIRC formed a separate subsidiary entity, EclipseJet Aviation International, Inc., for purposes of this acquisition. For ease of explanation and to accord with the nomenclature used by the parties, we will refer to ETIRC and all of its subsidiaries simply as "ETIRC."

The relationship between Eclipse and ETIRC began in 2004 when ETIRC became both a customer for and distributor of Eclipse's aircrafts. After three years as a customer and distributor, ETIRC became an investor in Eclipse in late 2007, providing Eclipse with a significant loan in exchange for preferred stock. Around the same time, Eclipse and ETIRC also agreed to a Memorandum of Understanding under which ETIRC was to buy aircraft kits from Eclipse to be assembled by a factory in Russia ("Russian factory deal"). This arrangement was to be financed in large part by VEB, and money generated from this project was expected to play a large role in ensuring that Eclipse could maintain its working capital requirements for the upcoming year. Shortly thereafter, in early 2008, ETIRC purchased additional preferred stock in Eclipse and, as part of a restructuring agreement, Eclipse agreed to appoint two representatives of ETIRC to its five-member board of directors. Following these investments, ETIRC continued to provide Eclipse with financial support as needed.

In June 2008, the closing of the Russian factory deal became delayed and Eclipse began to run out of money. As Eclipse's financial troubles mounted, its dependency on ETIRC grew and, after Eclipse breached its minimum cash covenant required to operate, ETIRC provided Eclipse with a $25 million unsecured loan to help keep the company solvent. Shortly thereafter, ETIRC's Chairman, Roel Pieper, was named acting Chief Executive Officer of Eclipse.

Despite ETIRC's support, Eclipse's solvency was short-lived. Although the Russian factory deal continued to progress and Pieper reported to Eclipse's board of directors that the issues that had caused its delay had been resolved, the timing of the closing remained uncertain, and, by November

5

2008, Eclipse had again fallen below its minimum cash covenant. At that point, an ad hoc committee of Eclipse's noteholders froze all company accounts, and Eclipse's board of directors began to explore the company's options via bankruptcy proceedings.

The board of directors considered pursuing three possible courses of action in bankruptcy: (1) auctioning off Eclipse's assets as a whole pursuant to Section 363 of the Bankruptcy Code, 11 U.S.C. § 363(b)(1), with ETIRC serving as a "stalking horse" bidder; [3] (2) auctioning off the company's assets as a whole in a "naked" sale pursuant to Section 363—that is, conducting an auction without a "stalking horse" bidder, J.A. 960; and (3) liquidating the company pursuant to Chapter 7 of the Bankruptcy Code. ETIRC expressed a "genuine interest" in continuing Eclipse's business, J.A. 960, and committed an additional $1.6 million

---

[3] A "stalking horse" bidder enters into an asset purchase agreement with the debtor (in this case, Eclipse) prior to an auction. The price agreed upon in the asset purchase agreement must then withstand the auction, conducted in accordance with bidding procedures approved by the bankruptcy court. Thus, "[t]he purpose of a stalking horse in the context of a § 363 sale is to establish a competitive floor or minimum bid amount for the purchase of the debtor's business, thereby preventing lowball offers that would fail to provide a minimum amount of value." Rakhee V. Patel & Vickie L. Driver, *Toto, I've A Feeling We're Not in Kansas Anymore: Bankruptcy Sales Outside the Ordinary Course of Business*, Fed. Law., February 2010, at 56, 58.

to help fund Eclipse's operations while the two sides negotiated an agreement for ETIRC to acquire Eclipse.

On November 25, 2008, Eclipse filed a petition for bankruptcy under Chapter 11 of the Bankruptcy Code along with an asset purchase agreement to sell substantially all of the company's assets to ETIRC pending an auction. The deal included a provision that VEB would provide ETIRC with a $205 million loan, and, although the asset purchase agreement did not contain any express provisions requiring ETIRC to take on Eclipse's employees, it specifically provided that Eclipse was to continue operating its business and retain its employees through closing. The Bankruptcy Court entered an order approving the proposed procedures governing the auction and sale, and an auction and sale hearing were scheduled for mid-January 2009.

Eclipse did not receive any additional qualifying bids for the company, and, after a multiple-day sale hearing, the Bankruptcy Court entered an order on January 23, 2009, approving a second amended asset purchase agreement under which Eclipse was to be sold to ETIRC. Although ETIRC's receiving additional financing was not a condition of the sale's closing, the amended agreement stated that VEB had delivered a fully executed commitment letter confirming that it would provide ETIRC with a $205 million loan to finance the sale. Like the original agreement, the amended agreement did not require ETIRC to retain Eclipse's employees, but did provide that Eclipse was to continue its full operations through closing. Lastly, although the agreement did not contain a specific closing date, it afforded both parties the option to terminate the agreement if closing did not occur by February 28, 2009.

In the month that followed, VEB took ETIRC and Eclipse on a roller coaster ride of promises and assurances that never came to fruition. Following the Bankruptcy Court's approval of the agreement, closing was originally scheduled for January 29th, but it did not move forward on that date because VEB was unexpectedly insolvent. Nonetheless, Pieper reported to Eclipse's board that he had been assured that then-Russian Prime Minister Vladimir Putin personally would make a decision on February 2nd as to whether the sale could still be funded. On February 3rd, Pieper and Daniel Bolotin, another ETIRC executive who sat on Eclipse's board of directors, reported to the board that VEB would be recapitalized on February 5th, that there was a "high likelihood" the sale's funding would be approved by the Russian parliament that same day, and that the funding would become available early the following week. J.A. 1001. Eclipse's disinterested directors,[4] however, were not comfortable with this uncertain arrangement and agreed that while they had "no reason to disbelieve" Pieper and Bolotin's reports, they would "need to see specific documentation . . . evidencing the approval of . . . the recapitalization of VEB . . . [and] the approval of the [funding for the sale]," and, without such documentation, they would recommend that the sale be called off and Eclipse's bankruptcy proceedings be converted

---

[4] Although Pieper and other ETIRC executives were members of Eclipse's board, all decision-making regarding the sale to ETIRC was delegated to Eclipse's two disinterested directors, Kent Kresa, who previously served as chairman of General Motors Co. and chairman and CEO of Northrup Grumman Corp., and Harold Poling, the former chairman and CEO of Ford Motor Co.

to a liquidation under Chapter 7 of the Bankruptcy Code. J.A. 1003-04.

Consistent with Pieper's report, on February 5th, the Russian parliament approved the recapitalization of VEB and ETIRC's funding, and Pieper was invited to Moscow the following week to sign documents finalizing the agreement. With the closing seeming imminent, ETIRC also agreed to provide additional funding of its own to cover the added costs Eclipse had incurred as a result of this delay.

Pieper arrived in Moscow on February 10th, and informed Eclipse executives and the board the next day that while, much to his surprise, VEB had not yet been recapitalized, the final necessary meeting would take place later that week and VEB would receive funds on either February 13th or February 16th, with the ETIRC funds becoming available shortly thereafter. Bolotin described Pieper's meeting with Prime Minister Putin's deputy as "positive," and Pieper indicated that "all of the background work in Russia has been successfully completed and all that remains is execution and timing." J.A. 1012-13.

At that same board meeting, Eclipse's CFO reported that the company had become administratively insolvent as of February 6th and was on pace to run out of money the week of February 20th. In light of Eclipse's dwindling finances, its disinterested directors resolved that if ETIRC had not received the funding or "satisfactory confirmation" of it by February 16th, they would recommend either a Chapter 7 liquidation or that all but a handful of Eclipse employees be furloughed to preserve the company's money while it waited for the VEB financing to arrive. J.A. 1015.

On February 16th, a Russian Governor appeared by phone at a meeting of Eclipse's full board of directors and informed them that VEB had been recapitalized, that funding the Eclipse project was one of Prime Minister Putin's top priorities, and that the Governor expected to have more information on the structure of the financing the following day. The board minutes also reflect that the Governor "expressed his optimism that the funding could occur rapidly." J.A. 1017. This was enough to assure Eclipse's disinterested directors that a conversion to liquidation was unnecessary at that time, but they agreed to move forward with the furlough if the funding did not arrive the following day. As an alternative possibility, the disinterested directors inquired of Pieper whether ETIRC could, at least in the short term, fund the agreement without the loan from VEB.

On February 17th, Pieper and Bolotin reported to the board that VEB had allocated a budget to fund the sale and there was a possibility that funding would arrive as early as the next day. Pieper also disclosed that, in the event the funding was further delayed, ETIRC did not have the capital to fund Eclipse on its own. At a meeting of the disinterested directors that same day, Eclipse's CFO informed the disinterested directors that, without further funding, the company was set to run out of money by February 27th. In light of this information, the disinterested directors agreed to proceed with the furlough to ensure that the company could continue through the anticipated closure. Accordingly, on February 18th, Eclipse employees were informed that "the sale of Eclipse Aviation is taking longer than expected" and that, although "all actions to date allow us to believe that the sale and closing of the overall process is well within reach," they were being furloughed indefinitely in order to "make the

10

company's remaining cash last as long as possible and give [Eclipse] the most time to complete the sale." J.A. 1025.

On February 19th, Pieper reported to Eclipse's CFO that VEB had approved all documentation, that the money had been allocated, and all that was needed was the final signoff from Prime Minister Putin. The next day, the ad hoc committee of noteholders informed Pieper that, due to ETIRC's failure to obtain financing, they had "no alternative" but to convert Eclipse's bankruptcy to a Chapter 7 liquidation. J.A. 691. Pieper informed the noteholders that there would be further meetings in Russia the following day, and that he would have more information then.

At the board meeting on February 21st, Pieper similarly reported he expected the funding to be approved later that afternoon, and Bolotin confirmed that a meeting was occurring that afternoon at the Moscow "White House" and a final decision would be made at that time. J.A. 1027-28. When the board reconvened later that day, however, Bolotin gave the board the bad news that, contrary to all prior representations, Prime Minister Putin had not made a decision on the funding, because he "still had to think about it." J.A. 1028. Bolotin also reported that the Russian Governor who had assured the board a few days earlier that the funding was coming could not attend the meeting with Prime Minister Putin due to a medical emergency, and that Bolotin would be receiving a more detailed description the following day of what had occurred during the meeting with the Prime Minister.

According to the noteholders' motion to convert, Pieper did not show up for a scheduled meeting that day and, on February 22nd, informed the committee that problems

11

appeared to have arisen with the financing in Russia. When no further updates of progress from Pieper or Bolotin had been received by February 23rd, the noteholders informed the board and Pieper that they were ready to pull the plug on the deal and to file a motion to convert Eclipse's bankruptcy to liquidation proceedings. Pieper asked for one more day to make the financing come through, and Bolotin advised the board that ETIRC's Moscow attorney would personally call Prime Minister Putin the following morning to advocate for the project, expressing confidence that he could provide a final answer to the board the next day. The noteholders and disinterested directors agreed to wait one more day for a definitive answer, but adopted a resolution directing management to file a motion to convert the bankruptcy to Chapter 7 liquidation proceedings at 2:00 p.m. on February 24th unless they received a "formal written commitment from the Russian Government" that committed to closing by February 26th—the day before Eclipse expected to run out of money. J.A. 1029-30. No commitment came that afternoon, and the motion to convert was then filed on February 24th.

Once the motion was filed, Eclipse emailed its employees informing them that despite its best efforts, "closing of the sale transaction has stalled and our company is out of time and money," and that because of the "dire circumstances in today's global marketplace" and the lack of any additional funding, the company's noteholders and board of directors had decided to convert Eclipse's bankruptcy from a reorganization under Chapter 11 to a liquidation under Chapter 7. J.A. 1039. The email explained that this meant the prior furlough had been converted into a layoff, effective February 19th, and that the employees would receive

information regarding their benefits packages in the mail later that week.

Eclipse's employees filed the class action complaint that gave rise to this appeal—an adversary proceeding in the Bankruptcy Court alleging that Eclipse's failure to give them sixty days' notice prior to the layoff violated the WARN Act. After discovery, the employees moved for partial summary judgment, asserting that Eclipse could invoke neither the Act's "faltering company" exception, nor its "unforeseeable business circumstances" exception to excuse its lack of notice, and Eclipse filed a cross-motion for summary judgment, contending that the "unforeseeable business circumstances" exception barred WARN Act liability. The Bankruptcy Court agreed with Eclipse and granted summary judgment in its favor. *In re AE Liquidation, Inc.*, 522 B.R. 62 (Bankr. D. Del. 2014). The District Court affirmed on appeal, *In re AE Liquidation, Inc.*, 556 B.R. 609 (D. Del. 2016), and this appeal followed.

## II. Jurisdiction and Standard of Review

The Bankruptcy Court had jurisdiction under 28 U.S.C. § 157(b), the District Court had jurisdiction under 28 U.S.C. § 158(a), and we have jurisdiction under 28 U.S.C. § 158(d). In reviewing bankruptcy court decisions on appeal, we "stand in the shoes" of the district court and apply the same standard of review. *In re Global Indus. Techs., Inc.*, 645 F.3d 201, 209 (3d Cir. 2011) (en banc). Here, we exercise plenary review over the Bankruptcy Court's order granting summary judgment in favor of Eclipse. *See id.*

We will affirm the District Court's and, in turn, the Bankruptcy Court's grant of summary judgment only if we

13

conclude "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We must view the facts in the light most favorable to the nonmoving party and give that party "the benefit of all reasonable inferences." *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997). We do not weigh the evidence; rather, we assess whether the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, in this case, summary judgment is only appropriate if no reasonable jury could find Eclipse liable under the WARN Act.

## III.    Analysis

The WARN Act was enacted in response to significant worker dislocation that occurred throughout the 1970s and 1980s when "[a]s companies were merged, acquired, or closed, many employees lost their jobs, often without notice. . . . [And] [i]n some circumstances, the projected closing was concealed from the employees." *Hotel Emps. & Rest. Emps. Int'l Union Local 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 182 (3d Cir. 1999). To ensure that laid-off workers and their families receive "some transition time to adjust to the prospective loss of employment," 20 C.F.R. § 639.1, the Act requires employers to give sixty days' notice to all affected employees or their representatives prior to a mass layoff or a plant closing. 29 U.S.C. § 2102(a). While it is undisputed that Eclipse did not comply with this notice requirement, the Act contains multiple exceptions, and Eclipse asserts that one of them—the "unforeseeable business circumstances" exception—bars liability in this case.

14

That exception must be offered by the employer as an affirmative defense and applies when "the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." *Id.* § 2102(b)(2)(A). Specifically, the employer must demonstrate (1) that the business circumstances that caused the layoff were not reasonably foreseeable and (2) that those circumstances were the cause of the layoff. *Calloway v. Caraco Pharm. Labs., Ltd.*, 800 F.3d 244, 251 (6th Cir. 2015); 20 C.F.R. § 639.9(b). Even if an employer establishes that unforeseeable events prevented it from giving notice sixty days in advance, the Act still requires that employers "give as much notice as is practicable" under the circumstances, 29 U.S.C. § 2102(b)(3), including, where appropriate, "notice after the fact," 20 C.F.R. § 639.9.

Appellants contend that Eclipse has not met its burden of demonstrating that the unforeseeable business circumstances exception applies for three reasons. First, they argue, as a threshold matter, that Eclipse is ineligible for the exception because, even after the fact, it never provided its employees with proper notice of their termination. Second, they contend that Eclipse cannot show that the purported unforeseeable business circumstance—its failure to close its proposed sale to ETIRC—was, in fact, the cause of the mass layoff. Third, they assert that, even if the failure to close the sale was the cause of the layoff, the exception still would not apply because the failure to close was not "unforeseeable" but rather could have been anticipated at many points in the sixty-day window prior to the layoff. We address these contentions in order.

A.      **Sufficiency of Notice of Termination**

15

We turn first to Appellants' contention that Eclipse cannot qualify for the unforeseeable business circumstances exception to excuse its untimely notice of termination because, even when Eclipse did eventually inform its employees that they were being laid off, the contents of that notice and Eclipse's method of delivery were statutorily deficient under the WARN Act. *See Sides v. Macon Cty. Greyhound Park, Inc.*, 725 F.3d 1276, 1284 (11th Cir. 2013) ("[I]t is manifest that a WARN Act employer attempting to circumvent the 60–day notice requirement must still give *some* notice in accord with [the other requirements of the Act].").  Taking the requirements of the statute and the Department of Labor's implementing regulations together, any notice of a mass layoff must contain "(1) [t]he name and address of the employment site where the . . . mass layoff will occur, and the name and telephone number of a company official to contact for further information; (2) [a] statement as to whether the planned action is expected to be permanent or temporary . . .; (3) [t]he expected date of the first separation and the anticipated schedule for making separations; (4) [t]he job titles of positions to be affected and the names of the workers currently holding affected jobs," 20 C.F.R. § 639.7(c); and (5) when given less than sixty days in advance, "a brief statement of the basis for reducing the notification period," 29 U.S.C. § 2102(b)(3).[5]  This notice must be "based

---

[5] At least one district court has held that explicit reference to the WARN Act is required in order for notice to be proper under the statute. *See Weekes-Walker v. Macon Cty. Greyhound Park, Inc.*, 877 F. Supp. 2d 1192, 1208 (M.D. Ala. 2012) ("Although by itself not sufficient, a reference to the statute, however, is essential to proper notice because it provides the affected employees with the framework for

16

on the best information available to the employer at the time the notice is served," 20 C.F.R. § 639.7(a)(4), and delivered in a manner "which is designed to ensure receipt," *id.* § 639.8.

Here, all of these requirements are met. After learning that Eclipse's bankruptcy proceedings would be converted to a Chapter 7 liquidation on February 24, 2009, Eclipse's management sent the following message, in pertinent part, to all employees' work email addresses:

> We are very sad to report unexpected news today. Despite the efforts of many people at EclipseJet Aviation and ETIRC to obtain necessary funding to close the purchase of the assets of

evaluating the validity of the defense. One cannot assess the propriety of a legal defense without first having knowledge of the existence of the law."); *cf. Sides*, 725 F.3d at 1285 (affirming the District Court's ruling in *Weekes-Walker* on other grounds, but observing that, even had the employer given timely notice, "[t]he alleged notice provided by [the employer] did not reference the WARN Act"). Here, Appellants have waived any argument Eclipse's notice was deficient because it failed to make such an explicit reference by failing to raise it before the Bankruptcy Court, the District Court, or this Court. *See Gonzalez v. AMR*, 549 F.3d 219, 225 (3d Cir. 2008). Accordingly, although it may be a good practice for employers to make such a reference, we offer no opinion as to whether it is statutorily required.

17

Eclipse Aviation, the closing of the sale transaction has stalled and our company is out of time and money. Given the dire circumstances in today's global marketplace and the lack of additional debtor-in-possession funding, the senior secured creditors of the Company filed a motion today in US Bankruptcy Court in Delaware to convert the Chapter 11 case to a Chapter 7 liquidation. This action, under the circumstances, is being supported by the directors of Eclipse.

What does this mean for each employee? The furlough converted to a layoff effective Thursday, February 19, 2009. . . .You may have certain rights to seek payment in the bankruptcy proceeding; you may receive additional information about that from the bankruptcy court.

. . . Later this week you will receive a termination package in the mail which will have information regarding your benefits.

18

J.A. 1039. The following day, Eclipse mailed those same employees termination documents containing information about their benefits and the phone number of the vice president of human resources who could be contacted for further questions.

We perceive no deficiency in Eclipse's notice. The February 24th email was clear that the layoff (1) applied to all sites company-wide; (2) was permanent; (3) was effective retroactively to the date of the furlough; (4) was applicable to all employees; and (5) provided specific facts explaining both the reasons for the termination and the delay in the provision of notice—namely, the buyer's unexpected failure to obtain funding before Eclipse's debtor-in-possession reserves were depleted, the dire financial conditions in the global marketplace, the unavailability of additional funds, and the noteholders' resulting decision to convert Eclipse's case to a Chapter 7 liquidation.[6] Despite Appellants' contentions to the

---

[6] Although the email did not specifically provide the contact information for a company representative, the benefits letter, dated February 25, 2009, did, and Eclipse may claim the benefit of multiple communications combined for purposes of WARN Act notice. *Kalwaytis v. Preferred Meal Sys., Inc.*, 78 F.3d 117, 122 (3d Cir. 1996). While we have held that the effective date of a multi-part notice is the date of the final communication when the initial communication was ambiguous on such a fundamental issue as whether the layoff was temporary or permanent, *id.*, we have not had occasion to address whether an initial communication would likewise be insufficient to stop the clock where that communication omits the contact information for a company representative but indicates more information is forthcoming, and that contact

contrary, this information was sufficient to "assist" the employees in "understand[ing] the employer's situation and its reasons for shortening the notice period." *Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 389 (9th Cir. 1994).

Lastly, the email informing employees of the layoff was delivered in a manner designed to ensure receipt. Although Appellants contend that the email was sent to the "wrong addresses" because Appellants had already been furloughed and no longer had access to their work email accounts, Appellants' Br. 58, the record reflects both that Appellants had access to their work email accounts during the furlough, and that, when the furlough first began, members of management were told to instruct the employees in their respective departments to continue to monitor their work email accounts for further updates. Accordingly, we perceive no dispute of material fact as to whether the notice's contents or method of delivery violated the WARN Act, and we turn next to the question of whether Eclipse may excuse its failure to provide notice at an earlier date by relying on the unforeseeable business circumstances defense—that is, whether ETIRC's failure to obtain the financing necessary to finalize the sale was the cause of the mass layoff, *see infra* Part B, and, if so, whether that failure was reasonably foreseeable prior to February 24, 2009, *see infra* Part C.

## B.    Causation

---

information is promptly provided the following day. We need not do so here, as Appellants do not challenge the date of the notice on this ground, and any such argument is therefore waived. *See Gonzalez*, 549 F.3d at 225.

20

For the unforeseeable business circumstances exception to apply, Eclipse must demonstrate that the allegedly unforeseeable event was, in fact, the cause of the layoff. *Calloway*, 800 F.3d at 251; 20 C.F.R. § 639.9(b). For the reasons set forth below, we agree with the District and Bankruptcy Courts that Eclipse has made this showing.

The WARN Act provides that "[i]n the case of a sale of part or all of an employer's business," the seller is responsible for providing employees notice of any mass layoff "up to and including the effective date of the sale," at which point that responsibility shifts to the buyer. 29 U.S.C. § 2101(b)(1). When a sale proceeds on a "going concern"[7] basis, it is presumed that the sale "involves the hiring of the seller's employees unless something indicates otherwise," regardless of whether the seller has expressly contracted for the retention of its employees. *Wilson v. Airtherm Prods., Inc.*, 436 F.3d 906, 912 (8th Cir. 2006); *see also Int'l All. of Theatrical & Stage Emps. v. Compact Video Servs., Inc.,* 50 F.3d 1464, 1468 (9th Cir. 1995).

Relying on this presumption, Eclipse urges that because ETIRC had agreed to purchase Eclipse as a going concern and nothing indicates otherwise, the District Court was correct to find that the employees would have been retained (i.e., the layoff would not have occurred but for

---

[7] Black's Law Dictionary defines "going concern" as "[a] commercial enterprise actively engaging in business with the expectation of indefinite continuance." *Going Concern*, Black's Law Dictionary (10th ed. 2014); *see also Day v. Celadon Trucking Servs., Inc.,* 827 F.3d 817, 828 (8th Cir. 2016) (adopting same definition).

21

ETIRC's failure to obtain the financing necessary to finalize the sale). In particular, Eclipse points out that Section 6.7 of the second amended asset purchase agreement, entitled "Conduct of Business Prior to the Closing Date," expressly required Eclipse to "use commercially reasonable efforts to . . . continue operating the Business as a going concern," to "maintain the business organization of the Business intact, including its agents, employees, consultants and independent contractors," and to "preserve the goodwill of the manufacturers, suppliers, contractors, licensors, employees, customers, distributors and others having business relations with the Business," while prohibiting Eclipse from "offer[ing] employment for any period on or after the Closing Date to any employee or agent of the Business unless [ETIRC] has determined not to make an offer of employment" or "otherwise attempt[ing] to persuade any such employee or agent to terminate his or her relationship with the Business." J.A. 551-52. These terms, which expressly contemplate a going concern transaction and prevent Eclipse from disturbing any aspect of its operations or employment relationships strongly indicate that, had the sale been consummated, ETIRC intended to continue Eclipse's operations largely as is.

In addition, circumstantial evidence from the discussions leading up to Eclipse's bankruptcy and the subsequent formation of the asset purchase agreement support the same conclusion. The minutes of Eclipse's board meetings prior to its declaration of bankruptcy reflect that part of the reason it chose to pursue an auction of the company with ETIRC as a stalking horse bidder rather than a "naked" auction with no such bidder was to avoid "deep cuts in the Company's operations," J.A. 956, as the "naked" auction

22

would have required Eclipse to lay off 75% of its employees, J.A. 958. Moreover, when discussing the "employment base of [Eclipse]" as part of the sale, ETIRC "indicated [its] preference that the Company remain at its current employment size," J.A. 964, and, at the sale hearing before the Bankruptcy Court, Eclipse's counsel represented that the sale "would maintain the going concern" of the company and "preserve[] employment for hundreds of employees," J.A. 673. ETIRC's counsel likewise stated at the sale hearing that there was a significant benefit to this "going concern" sale as it would "continue to provide jobs and the ability for customers who already purchased planes to service them." J.A. 674. Lastly, as the Bankruptcy Court observed, ETIRC had set aside a sizable operating budget for the post-sale entity, and two high-ranking Eclipse executives testified that they believed—albeit based on their subjective impressions—that ETIRC did not intend to lay off Eclipse's workforce.

For their part, Appellants do not dispute that Eclipse was to be sold on a going concern basis and that such sales are presumed to transfer all employees, but argue that there is something that indicates otherwise: two express provisions of the asset purchase agreement, that, in their view, rebut any presumption because "there is no evidence that a single employee would have been spared termination" had the sale been finalized.[8] Appellants' Br. 32. Specifically, Section 7.2

---

[8] Appellants also assert that the failure to finalize the sale could not have caused the layoff as a matter of simple "cause-and-effect logic" because the layoff was made retroactive to February 19th, and the sale did not fall apart until February 24th. Appellants' Br. 26. This argument is easily rejected. Eclipse's final decision to lay off its

23

of the agreement provides, "[u]nder no circumstances shall [ETIRC] assume or be obligated to pay . . . any claims of or liabilities of [Eclipse's] Employees, including but not limited to, any claims or liabilities related to . . . liability under the WARN Act, salaries, vacations, . . . [and] severance pay . . . , which Employee Claims shall be and remain the liability, responsibility and obligation of the Sellers." J.A. 556. And Section 7.3 entitled "Employment," provides:

> [ETIRC] may (but shall not be required to), in its sole and absolute discretion, offer employment to any and all individuals employed by [Eclipse] in connection with the Business as of the Closing Date . . . . [ETIRC's] employment of any individuals previously employed by [Eclipse] shall be on an "at will" basis and on such other terms and conditions of employment as [ETIRC] shall offer in its sole discretion. Except as otherwise agreed to in writing, [ETIRC] shall be under no obligation to employ or continue

---

employees post-dated the noteholders' February 24th motion to convert Eclipse's bankruptcy to a Chapter 7 liquidation—the motion which, for all intents and purposes, marked the failure of the sale. Eclipse's decision to make this February 24th layoff retroactive to an earlier date has no bearing on our causation analysis.

24

to employ any individual for any period. The employees who accept [ETIRC's] offer of employment and who commence employment with [ETIRC] from and after the Closing Date shall be referred to herein as the "Hired Employees." Under no circumstance shall any individual employed or formerly employed by [Eclipse] become an employee of [ETIRC] unless such individual becomes a Hired Employee.

J.A. 556. Appellants assert that these provisions reflect that ETIRC "renounced any intent or obligation to hire [Eclipse's] employees *en masse* at the closing." Appellants' Br. 27.

We conclude Eclipse has the better of the argument. Although these terms freed ETIRC from any binding obligation to retain Eclipse's employees and prevented it from incurring liabilities were it not to retain them, we agree with the District and Bankruptcy Courts that these terms are mere "boilerplate language address[ing] a buyer's typical litigation concerns over successor liability and third-party beneficiary claims." *In re AE Liquidation, Inc.*, 556 B.R. at 623; *see In re AE Liquidation, Inc.,* 522 B.R. at 69 (Bankruptcy Court observing that "such terms are boilerplate in going-concern sales and merely allow the buyer to pick which employees to retain"). While such boilerplate language perhaps signifies that the sustained employment of Eclipse's workforce was not a foregone conclusion, it does not rebut the presumption in favor of continued employment

in a going concern sale—especially in light of the significant evidence that ETIRC intended to carry on Eclipse's operations had the sale been finalized.[9]

In sum, the record supports—and at the very least does not rebut—the presumption that Eclipse's employees would have retained their jobs had the sale been finalized, and the District Court thus did not err in concluding as a matter of law that the failure to obtain financing for that sale was the cause of the layoff.

## C.    Foreseeability

We turn next to whether the failure of the sale was reasonably foreseeable before February 24, 2009—the date Eclipse notified its employees of the layoff. The implementing regulations provide that an "unforeseeable business circumstance" is one that was "not reasonably foreseeable at the time that 60–day notice would have been required," 20 C.F.R. § 639.9(b), but they do not define what makes a business circumstance "not reasonably foreseeable."

---

[9] In support of their argument that the sale's failure did not cause the layoff, Appellants also cite to Pieper's testimony at the sale hearing that he had not made any promises of employment to any Eclipse employee and had made "[z]ero" decisions as to what Eclipse employment contracts ETIRC would assume if the deal were approved. J.A. 662-63. When considered alongside the other evidence in the record, Pieper's testimony, which, in context simply preserved ETIRC's ability to choose at a later date the specific employees it would retain, also does not rebut the presumption of continued employment resulting from the going concern sale.

Instead, the regulations counsel that courts are to undertake a fact-specific inquiry to assess on a case-by-case basis whether, in failing to anticipate the circumstances that caused the closing, the employer "exercise[d] such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market." *Id.* § 639.9(b)(2); *see also Loehrer v. McDonnell Douglas Corp.*, 98 F.3d 1056, 1060 (8th Cir. 1996). Likewise, under our case law, we consider "the facts and circumstances that led to the closing in light of the history of the business and of the industry in which that business operated." *Elsinore*, 173 F.3d at 186.

Seeking additional guidance on how to assess such facts and circumstances, the District and Bankruptcy Courts have invoked the test adopted by the Fifth Circuit in *Halkias v. General Dynamics Corp.*, 137 F.3d 333, 336 (5th Cir. 1998), requiring that in order to be "reasonably foreseeable" an event must be "probable." *In re AE Liquidation, Inc.*, 556 B.R. at 619; *In re AE Liquidation, Inc.*, 522 B.R. at 69. Eclipse urges that this is the correct standard, and that we join the four Courts of Appeals, in addition to the Fifth Circuit, that have adopted it. *See United Steel Workers of Am. Local 2660 v. U.S. Steel Corp.*, 683 F.3d 882, 887 (8th Cir. 2012); *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 876 (10th Cir. 2009); *Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 589 (7th Cir. 2005); *Watson v. Mich. Indus. Holdings, Inc.*, 311 F.3d 760, 765 (6th Cir. 2002). Appellants, on the other hand, contend the Act does not set so high a threshold for notice and that reasonably possible outcomes, although perhaps not more likely than other outcomes, should be deemed sufficiently foreseeable to trigger the notice requirement. At the very least, Appellants urge that where two outcomes are

equally possible—in a game of roulette, for example, where the ball will land on either black or red—both must be considered "reasonably foreseeable" even though neither crosses the more-likely-than-not threshold. Appellants' Br. 38.

Below, we will first address what standard should be applied when assessing "reasonable foreseeability" and then assess how that standard applies under the facts of this case.

1. Determining the Appropriate Foreseeability Test

In *Halkias*, the Fifth Circuit was presented with a defense contractor that was forced to lay off its employees after the United States Navy canceled a significant contract due to the contractor's cost overruns. 137 F.3d at 334. When assessing the appropriate test for reasonable foreseeability, the court held that anything less than a probability would be "impracticable" because cost overruns are a frequent occurrence that only rarely result in cancellation, although cancellation is a "possibility" each time an overrun occurs. *Id.* at 336. Thus, the court reasoned, if the mere possibility of a layoff were enough to trigger the WARN Act, contractors "would be put to the needless task of notifying employees of possible contract cancellation and concomitant lay-offs" every time such an overrun occurred, even though such a layoff was still not likely. *Id.* at 336.

In the nineteen years since *Halkias* was decided, every Circuit to have considered this probability standard for WARN Act notice has adopted it. *See United Steel Workers of Am. Local 2660*, 683 F.3d at 887 (employer's knowledge that economic downtown would hurt demand for its product

28

did not bar unforeseeable business circumstances exception because "[n]othing in the record suggests that the extent of the economic downturn and its effects on the steel industry were probable any time before [the time notice was given]"); *Gross*, 554 F.3d at 876 ("[W]e do not rely on the mere possibility that layoffs will occur, but rather look for their probability."); *Roquet*, 398 F.3d at 589 (holding that while it was "[c]ertainly . . . possib[le]" that accounting firm itself rather than its individual officers would be indicted, that possibility never rose to the level of "probable" and thus unforeseeable business circumstances exception applied); *Watson*, 311 F.3d at 765 (adopting probability standard and observing that "WARN was not intended to force financially fragile, yet economically viable, employers to provide WARN notice . . . when there is a *possibility* that the business may fail at some undetermined time in the future.").[10]

Our Circuit has never directly spoken on this probability standard, but our adoption of it is supported by the discussion and analysis in our only precedential opinion to date addressing the unforeseeable business circumstances exception to the WARN Act. In *Hotel Employees & Restaurant Employees International Union Local 54 v. Elsinore Shore Associates*, 173 F.3d 175 (3d Cir. 1999), we held that a casino's closure was not reasonably foreseeable and that the unforeseeable business circumstances defense

---

[10] Multiple district and bankruptcy courts have also adopted the *Halkias* probability standard. *See, e.g.*, *In re Jevic Holding Corp.*, 496 B.R. 151, 160-61 (Bankr. D. Del. 2013); *Law v. Am. Capital Strategies, Ltd.*, No. 3:05-0836, 2007 WL 221671, at *13 (M.D. Tenn. Jan. 26, 2007).

therefore applied to excuse that casino's failure to notify its employees prior to its being shut down by the New Jersey Casino Control Commission. *Id.* at 187. While we did not explicitly address whether we found that the closure was not "probable," not "possible," or something in between, the facts that we recounted—including that the Control Commission refused to renew the casino's license due to its financial struggles a month prior to the closure and that a Commission-appointed conservator struggled for an extended time to find a buyer for the casino—indicated that we were applying a higher standard more akin to a probability test. *Id.* at 178.

In dicta, moreover, we endorsed the logic of that standard, observing that the WARN Act was not intended to "require an economically viable employer to provide notice of a possible—but unlikely—closing" and that requiring such premature notice could have the perverse effects of causing creditors to refuse to provide the struggling company with further credit or prompting employees to unnecessarily leave their jobs—potentially forfeiting valuable future assets such as unvested benefits. *Id.* at 185 n.7. And we also noted that these unintended consequences not only would not serve the purposes of the WARN Act but "would increase the chance that an employer will be forced to close and lay off its employees, harming precisely those persons WARN attempts to protect." *Id.*

Here, we have occasion to go a step further than we did in *Elsinore* and to join our Sister Circuits in holding that the WARN Act is triggered when a mass layoff becomes probable—that is, when the objective facts reflect that the

layoff was more likely than not.[11]  This standard strikes an appropriate balance in ensuring employees receive the protections the WARN Act was intended to provide without imposing an "impracticable" burden on employers that could put both them and their employees in harm's way.[12]  *Halkias*, 137 F.3d at 336.

---

[11] We emphasize that this probability test will always be an objective one, *Watson*, 311 F.3d at 764, and WARN Act liability may not be avoided by an employer clinging to a glimmer of hope that it will remain open against improbable odds.  Even the most well-intentioned subjective beliefs will not excuse failure to comply with the WARN Act's notice requirement if they are not "commercially reasonable" in light of the facts that were available to the company in the sixty-day period prior to the layoff.  20 C.F.R. § 639.9(b)(2).

[12] Of course, "reasonable foreseeability" may have a different meaning in different contexts and sometimes has been interpreted to mean less than a probability.  *See, e.g.*, *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703 (2011) (holding that, in the context of the Federal Employers' Liability Act, a harm is reasonably foreseeable unless "a person has no reasonable ground to anticipate that a particular condition . . . would or might result in a mishap and injury" (alterations in original) (citation omitted)); *Indian Brand Farms, Inc. v. Novartis Crop Protection Inc.*, 617 F.3d 207, 226 (3d Cir. 2010) (noting, in the products liability context, than an occurrence is reasonably foreseeable if "in light of the general experience within the industry when the product was manufactured, [the occurrence] objectively and reasonably could have been anticipated" (citation omitted)).  In the

Companies in financial distress will frequently be forced to make difficult choices on how best to proceed, and those decisions will almost always involve the possibility of layoffs if they do not pan out exactly as planned. If reasonable foreseeability meant something less than a probability, nearly every company in bankruptcy, or even considering bankruptcy, would be well advised to send a WARN notice, in view of the potential for liquidation of any insolvent entity. And, as we explained in *Elsinore*, there are significant costs and consequences to requiring these struggling companies to send notice to their employees informing them of every possible "what if" scenario and raising the specter that one such scenario is a doomsday. 173 F.3d at 185 n.7. When the possibility of a layoff—while present—is not the more likely outcome, such premature warning has the potential to accelerate a company's demise and necessitate layoffs that otherwise may have been avoided. *See Roquet*, 398 F.3d at 589 ("[T]he WARN Act is not intended to deter companies from fighting to stay afloat . . . ."); *Elsinore*, 173 F.3d at 185 n.7. Thus, we join the many courts that have held this is not the burden the WARN Act was meant to impose and that a layoff becomes reasonably foreseeable only when it becomes more likely than not that it will occur.[13]

---

WARN Act context, however, that lower standard is not appropriate for the reasons we have explained.

[13] Appellants assert that the *Halkias* test unfairly "transfers the defendant's burden to the plaintiff" by requiring plaintiffs to prove that a layoff was not "probable." Reply Br. 24. Appellants offer no support for this contention, and we reiterate that the burden of proof remains on the employer to

2. Application of the Reasonable Foreseeability Test

Applying this foreseeability analysis to the facts of this case, we conclude that Eclipse has met its burden of demonstrating that ETIRC's failure to obtain the financing necessary to close the sale was not probable prior to Eclipse's decision to lay off its employees on February 24, 2009. The first relevant date we must consider for WARN Act purposes is December 26, 2008, the sixty-day mark at which WARN Act notice would have been due. At that point in time, Eclipse was preparing to be sold on a going concern basis via auction procedures approved by the Bankruptcy Court, with ETIRC serving as a stalking horse bidder. When no additional bidders materialized, the Bankruptcy Court held a sale hearing at which it heard multiple days of testimony before ultimately approving Eclipse's sale to ETIRC under the terms of the amended asset purchase agreement on January 23, 2009. As it could hardly be said that the failure of the sale appeared probable to Eclipse on the very day the Bankruptcy Court approved it, Eclipse cannot be held liable for its failure to provide WARN Act notice to its employees prior to January 23, 2009.[14]

---

demonstrate that the layoff in question was not probable at the time that WARN Act notice became due. *See Gross*, 554 F.3d at 877 (holding employer "met its summary judgment burden of establishing that [the unforeseeable circumstance] . . . while always a possibility, was unforeseeable").

[14] Although Appellants make much of Eclipse's CFO's deposition testimony that even prior to the sale's approval Eclipse had "a fair bit of concern over the ability [of ETIRC]

33

Whether a reasonable jury could find that the exercise of commercially reasonable business judgment required WARN Act notice to be given at some point in the month between the approval of the sale and its ultimate demise is a more difficult question. As Appellants point out, Eclipse's disinterested directors were demanding a more "concrete funding commitment" from VEB as early as February 2nd, J.A. 998-1000, and were considering converting Eclipse's bankruptcy to a Chapter 7 liquidation on February 4th if such a commitment did not materialize. Although no direct "concrete" commitment from VEB ever came, Eclipse's executives and its board received constant assurances from Pieper and Bolotin that funding was forthcoming in a matter of weeks and, as Eclipse began to run out of money, in a matter of days. While Eclipse's disinterested directors were clearly perturbed by VEB's delays[15] and continued to discuss

to provide financing to close the deal," the CFO also testified that those concerns were resolved by Eclipse's "removing financing as a contingency to closing and requesting to see commitment letters from the financers." J.A. 904. While VEB's commitment letters to ETIRC were not as "solid" as he would have liked, J.A. 904, he explained, he ultimately felt "comfortable enough that [the] money [wa]s going to materialize," J.A. 906, and the Bankruptcy Court clearly agreed when it approved the sale on those terms. This slight discomfort with ETIRC's financing arrangement does not create a factual dispute as to whether it was probable that the sale was going to fail on or before its final approval in late January 2009.

[15] We note that while these constant delays were no doubt frustrating to Eclipse, they were not entirely

the possibility of liquidating the company without more definite financial commitments, they ultimately deemed the continual oral assurances they received from Pieper and Bolotin to be compelling enough to continue on a path towards closing.

While these assurances may look like empty promises in hindsight, we must consider the decisions Eclipse made based on the information available to it at the time and "in light of the history of the business and of the industry in which that business operated," *Elsinore*, 173 F.3d at 186. This history included Eclipse and ETIRC's business relationship for years prior to the sale, with ETIRC taking on an even more active role in Eclipse's affairs in the months leading up to the bankruptcy. Moreover, Pieper and Bolotin, while acting as representatives of ETIRC through much of the sale process, were both members of Eclipse's board of directors, with Pieper serving as Eclipse's CEO. Thus, by the time the companies began to negotiate the sale, ETIRC and its representatives had repeatedly expressed their desire to keep Eclipse operational, and had proven their willingness to act in furtherance of that goal—filling board seats and providing financial assistance on multiple occasions to help keep Eclipse afloat. This longstanding relationship bears heavily

unexpected and do not in and of themselves indicate it was likely the deal would fail. As the District Court observed, the asset purchase agreement expressly anticipated a prolonged closing period by providing a month-long "cushion" for the deal to close—until February 28, 2009—before either party was given the option to terminate the contract. *In re AE Liquidation, Inc.*, 556 B.R. at 620.

on our assessment of Eclipse's expectations in the face of ETIRC's continual reports that funding was on the way, for these were not grandiose promises from a stranger, but assurances from a credible business partner with a demonstrated commitment to Eclipse's survival.[16] With this history in mind, we review the specific assurances Eclipse received regarding ETIRC's funding to assess whether the sale's failure ever crossed the line from possible to probable before February 24, 2009.

Considering first the assurances Eclipse received prior to Prime Minister Putin's February 21st decision not to act on the funding of the sale, we conclude that before that point Eclipse had little reason to believe the sale would not close. While it was forced to encounter numerous frustrating delays as it had with the Russian factory deal previously, Eclipse had

---

[16] Appellants contend that the history of the parties' business dealings cut in their favor, as the record reflects that VEB had been stringing Pieper along with unfulfilled promises of funding for the Russian factory deal since January 2008. Thus, Appellants contend that this "checkered history" of ETIRC and Eclipse's business dealings with VEB "made the sale's failure at least reasonably foreseeable, if not the likely outcome." Appellants' Br. 40. Although VEB's prior failure to timely fund the factory deal is relevant to our assessment of whether a similarly situated employer would have recognized at an earlier date that VEB's funding was unlikely to materialize, it does not by itself create a dispute of material fact when considered in light of the history and context of Eclipse's relationship with ETIRC. *See Elsinore*, 173 F.3d at 186.

received consistent positive reports from Pieper, who had just returned from Moscow where he met with one of the Prime Minister's deputies, Bolotin, and a Russian Governor directly. These credible parties reported that VEB had been recapitalized, that funds had been allocated to the sale, and that the funding would be forthcoming in a matter of days. Although it was of course possible the funding could fall through, Eclipse had a reliable basis to believe it was more likely than not the funding would receive Prime Minister Putin's final approval on February 21st and be dispersed shortly thereafter.[17] Before February 21st, in other words, it appeared probable the sale would close, and no WARN Act notice was required.

The last three days between February 21st and 24th present a closer question, as much of the optimism surrounding the sale appeared to have dissipated. Still, no reasonable jury could conclude that the sale's failure became probable in that time frame. Eclipse had received every indication that the sale was about to close up until that point, and Bolotin's preliminary report from the February 21st meeting—with more information supposedly forthcoming—indicated only that the Prime Minister simply "still had to think about" the sale further after one of his colleagues who

---

[17] In addition to the reasons given above, Eclipse had even less reason to believe the sale would not close prior to February 17th, when ETIRC disclosed it did not have the capital to fund Eclipse without the VEB loan, even on an interim basis. As ETIRC had not made its proposed loan from VEB a condition of closing the deal, there was potential up until this disclosure that the deal could close even if the VEB funding was significantly delayed or did not materialize.

was heavily involved with the sale had missed the meeting due to a medical emergency. J.A. 1028. Although Pieper informed the noteholders on the 22nd that it appeared problems had arisen with the financing, it was not apparent what those problems were, and, on the 23rd both Pieper and Bolotin expressed their beliefs that any issues could be resolved promptly, with Bolotin promising a definitive answer by February 24th. As soon as the February 24th deadline passed with no positive report, Eclipse filed the motion to convert, and notified its employees accordingly.

Although the chances of the sale falling apart may have reached fifty-fifty while the company waited to hear if and when Prime Minister Putin planned to next consider releasing the already-allocated funds for the closing, Pieper and Bolotin continued to reassure the board and the noteholders that any issues with the financing could be resolved and promised there would be an answer within days. Under these circumstances, and taking account of the historical relationship between the companies, it was commercially reasonable for Eclipse to believe that the sale was still at least as likely to close as to fall through before February 24th, so that no WARN Act notice was required prior to that time.[18] *See Roquet*, 398 F.3d at 589 (holding that

---

[18] Appellants insist that, at the very least, Eclipse ought to have provided its employees with conditional notice under 20 C.F.R. § 639.7(a)(3). This regulation however, contains only permissive language, providing that "[n]otice *may* be given conditional upon the occurrence or nonoccurrence of an event." *Id.* (emphasis added). While conditional notice may be a useful tool to help employers ensure that they have complied with the WARN Act in close cases, such notice is

in-person meeting and subsequent ongoing investigation by Department of Justice regarding company's criminal liability did not make company's indictment "probable"); *Burnsides v. MJ Optical, Inc.*, 128 F.3d 700, 703 (8th Cir. 1997) (holding seller was not liable under the WARN Act for "believing the sale would go through according to the . . . letter of intent" when buyer changed the previously agreed upon terms at the last minute).

## IV.    Conclusion

For the foregoing reasons, Eclipse has met its burden of demonstrating that its eventual shutdown and layoff of its employees was not probable prior to February 24, 2009, and it is entitled to invoke the WARN Act's unforeseeable business circumstances exception as a matter of law. Accordingly, we will affirm the order and judgment of the District Court, and by extension the Bankruptcy Court.

---

not mandatory, and Eclipse cannot be held liable for its failure to provide it. *See Loehrer*, 98 F.3d at 1063 n.9.